**SO ORDERED: September 29, 2009.**

**Basil H. Lorch III
United States Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| JOSEPH D. WHITE and | ) | CASE NO. 08-93625-BHL-13 |
| SUSIE J. WHITE, | ) | |
| Debtors. | ) | |

## ORDER

This matter comes before the Court on the **Objection to Proof of Claim** filed by the Debtors on March 16, 2009 [Docket No. 22], and the **Response to Objection to Claim** filed by AmeriCredit Financial Services, Inc. on April 14, 2009. The parties subsequently submitted the issue to the Court's discretion based upon a **Joint Stipulation of Facts** filed on August 31, 2009.

Background

The facts, as stipulated by the parties, are fairly straightforward. The Creditor, AmeriCredit Financial Services, Inc. ["AmeriCredit"] holds a secured claim dated January 7, 2009, in the principal amount of $22,081.96. That claim represents amounts financed to purchase a vehicle for the Debtors' personal use within 910 days of the bankruptcy filing and it includes $7,000.00 which represents a "negative trade-in" in that transaction. AmeriCredit

asserts that the entire amount of $22,081.96 is a purchase-money secured interest ["PMSI"] by virtue of section 1325(a) of the Bankruptcy Code. The Debtors object to AmeriCredit's claim and have filed an Amended Plan which proposes to bifurcate the claim into secured and unsecured parts, treating the negative equity as an unsecured claim.

Discussion

This Court previously considered the treatment of negative equity under the "hanging paragraph" of section 1325(a) in *In re Gibson*, Case No. 07-90752-BHL-13 (October 25, 2007). In that case, it was held that section 1325(a) protects only those funds advanced toward the purchase price of the vehicle as a PMSI. The creditor was therefore found to have a PMSI in the vehicle only to the extent of the purchase price and excluding any amounts used to pay for negative equity on the debtors' trade-in or insurance. Because case law is rapidly evolving on this issue, however, it seems prudent to revisit the matter in light of developing precedent.

Various circuit courts or B.A.P.s have recently considered this question and a definite trend appears to be emerging as to the treatment of negative equity. The earliest court to rule on the issue was *In re Penrod*, 392 B.R. 835 (B.A.P. 9th Cir. 2008), which held that negative equity is not part of the PMSI protected by the 910-day rule in section 1325(a). Since then, every other circuit which has weighed in on this point has concluded otherwise. *In re Callicott*, 2009 WL 2870501 (8th Cir.); *In re Dale*, 2009 WL 2857998 (5th Cir.); *In re Ford*, 574 F.3d 1279 (10th Cir. 2009); *In re Price*, 562 F.3d 618 (4th Cir. 2009); *In re Padgett,* 408 B.R. 374 (B.A.P. 10th Cir. 2009); *In re Graupner*, 537 F.3d 1295 (11th Cir. 2008); *In re Peaslee*, 547 F.3d 177 (2nd Cir. 2008) *cert'd, Matter of Peaslee*, – N.E.2d –, 2009 WL 1766000 (N.Y. June 24, 2009).

Courts within the Seventh Circuit, however, are split. Some bankruptcy courts, including

this one, have found that the negative equity is not part of the purchase-money security interest. *See, e.g.*, *In re Gibson, supra*; *In re Crawford*, 397 B.R. 461 (Bankr.E.D.Wis. 2008); *In re Hernandez*, 388 B.R. 883 (Bankr.C.D.Ill. 2008). Yet other courts have found to the contrary. *See, e.g., In re Myers,* 2008 WL 2445214 (Bankr.S.D.Ind. 2008); *In re Dunlap*, 383 B.R. 113 (Bankr.E.D.Wis. 2008); *In re Smith*, 401 B.R. 343, (Bankr.S.D.Ill. 2008); *In re Morey*, 2009 WL 2916685 (Bankr.E.D.Wis. Sept. 9, 2009).

Taking a fresh look at the question, this court continues to believe that the minority position, so well expressed by Judge Markell in *In re Penrod*,[1] is the better reasoned course. That position is essentially premised on the finding that negative equity simply does not fit within the U.C.C. definition of a "purchase-money obligation" or "price" of the collateral, in light of Official Comment 3 to the U.C.C.,[2] which reads in part:

> [T]he definition of "purchase-money obligation," the "price" of collateral or the "value given to enable" includes obligations for expenses incurred in connection with acquiring rights in the collateral, sales taxes, duties, finance charges, interest, freight charges, costs of storage in transit, demurrage, administrative charges, expenses of collection and enforcement, attorney's fees, and other similar obligations.
> The concept of "purchase-money security interest" requires a close nexus between the acquisition of collateral and the secured obligation. Thus, a security interest does not qualify as a purchase-money security interest if a debtor acquires property on unsecured credit and subsequently creates the security interest to secure the purchase price.

Admittedly, the foregoing list of obligations "incurred in connection with acquiring rights in the

---

[1] 392 B.R. 835.

[2] See, e.g., *In re Callicott*, 386 B.R. 232 (Bankr.E.D.Mo. 2008); *In re Riach*, 2008 WL 474384 (Bankr.D.Or. 2008); *In re Look*, 383 B.R. 210 (Bankr.D.Me. 2008); *In re Johnson*, 380 B.R. 236 (Bankr.D.Or. 2007); *In re Acaya*, 369 B.R. 564 (Bankr.N.D.Cal. 2007); *In re Bray*, 365 B.R. 850 (Bankr.W.D.Tenn. 2007).

collateral" is illustrative and not exhaustive.  But it is noteworthy that it does not include value given to pay off an existing debt, which is a significant and ever-recurring theme in the business of new-car financing.[3]  The Comment is silent as to existing debt, it would seem, because the drafters did not intend to include that type of expense within the confines of the statute. Negative equity is clearly not in the nature of or in any way similar to the types of expenses cited in the Comment.  It is neither an expense "incurred in connection with acquiring rights in the collateral" nor is it similar to sales taxes, finance charges, freight, or administrative charges.  As noted by another court, the nature of the expense items listed in Official Comment 3 are closely connected with the purchase of the vehicle itself and include costs normally associated with the enforcement of the security interest.  *In re Sanders*, 377 B.R. 836, 855 (Bankr.W.D.Tex. 2007).[4]

This court, together with the minority, finds that negative equity is merely the debtor's antecedent debt which is assumed by the auto seller.

> Context thus bolsters the conclusion that "price of the collateral" need not be given some exotic meaning or treated as some peculiar argot to sweep up more than the common understanding of the phrase is intended to convey.  One may borrow money to buy something (*e.g*, a new vehicle), and also borrow additional money for some other purpose (*e.g.*, to pay off the balance of a loan for the trade-in vehicle).  The part used to buy something is purchase money obligation.  The part used for some other purpose is not.  We can tell what part was used to buy something by simply looking at the price of the thing purchased.

*In re Sanders*, 377 B.R. at 853.  *See also*, *In re Wear*, 2008 WL 217172 (Bankr.W.D.Wash. 2008); *and see, In re Westfall*, 365 B.R. 755, 762 (Bankr.N.D.Ohio 2007)(questioning whether a

---

[3] Judge Markell notes that between 26% to 38% of all new car financing involves "negative equity" per GMAC.  *In re Penrod*, 392 B.R. at 842 (citing *In re Peaslee*, 358.R. 545, 554 (Bankr.W.D.N.Y. 2006)).

[4] *Rev'd* by *In re Sanders*, 403 B.R. 435 (W.D.Tex. 2009).

4

doctor's fee could be viewed as an enabling expense if a debtor would not have made it to the dealer's lot without an emergency appendectomy"). As stated by the Court in *Padgett*,[5] "without the payment of items such as taxes, title fees, duties and freight charges, an individual generally cannot acquire title to a vehicle. The same cannot be said about the payment of negative equity in a vehicle that is to be traded in." "Negative equity", as the dissent noted in *Ford*,[6] "is not a transaction cost, but a transfer of money for value. Much like a home equity loan used to pay a preexisting credit card debt, the portion of the auto loan attributed to negative equity is not used for the purchase of some new piece of collateral or the costs inherent in the purchase. It is used for another purpose altogether."

Courts that include negative equity as part of the purchase price for purposes of section 1325(a)'s "hanging paragraph" often rely upon the concept of *in pari materia* as support for their position. Those courts create a hybrid definition of "price" by borrowing from state sales and finance laws and grafting it onto the UCC. The state statutes which those courts draw from, however, are designed to inform consumers of the true cost of credit and have absolutely nothing to do with secured transactions or the function of the cited bankruptcy statute, which is to establish relative preferences among creditors. As the court concluded in *In re Acaya*, 369 B.R. 564, at 568-71 (Bankr.N.D.Cal. 2007), "[w]ith such different effects and goals, the two provisions – one based on disclosure and the other on preference – are not in pari materia." *See also, In re Mierkowski*, 2009 WL 2853586 (8th Cir. 2009) (Bye.J., dissenting).

Still other courts assert that the financing of negative equity is "value given to enable the

---

[5]   389 B.R. 203, 210 (Bankr.D.Kan. 2008), *rev'd,* 408 B.R. 374 (B.A.P. 10th Cir. 2009).

[6]   574 F.3d at 1289.

5

debtor to acquire rights in the collateral" under UCC § 9-103(a)(2). But this court finds that such monies are not "in fact so used" as further required by the statute. The monies are used to extinguish a pre-existing debt. Although the financing may be part of a single transaction and both rolled into one amount, such a reading elevates form over substance. Financing negative equity may well be made "integral" to the purchase agreement, depending on the circumstances or preferences of the parties, but that does not change the character of the transaction. That "package deal" approach utilized by some of the majority courts,[7] taken to its logical conclusion, bears illogical results. For instance:

> If the [debtors] were unable to drive themselves to the dealership, we would not consider the cost of a taxi as part of the price of the new truck, even if the dealer were willing to pay for it and fold it into the sales contract. If [they] did not qualify for a car loan because their resources were strained by too much credit card debt at high interest rates, they could not fold those debts into the PMSI for a new car even if the attendant lower interest rate solved their credit problem and enabled them to obtain the car loan.

*In re Ford*, 574 F.3d 1279, 1291 (Tymkovich, J., dissenting). It still remains both a refinancing of pre-existing debt and the extension of credit for the purchase price of the new car.

Admittedly, the hanging paragraph was drafted with a view toward providing protection to those creditors who extend credit to the debtor within 910 days of the bankruptcy for the purchase of a vehicle. It does that by preventing the "cramdown" of a debt owed to a purchase-money secured creditor if they have financed a vehicle for the debtors' personal use within 910 days of filing bankruptcy. But, given that the statute does not define a "purchase-money security interest", the protection it affords must necessarily be interpreted in deference to Article 9 of the

---

[7] *In re Graupner*, 537 F.3d at 1302; *In re Price*, 562 F.3d at 625; *In re Ford*, 574 F.3d 1279.

Uniform Commercial Code. Because Congress chose not to alter or expand the traditional meanings of purchase money obligation and PMSI, this Court has no authority to expand that meaning to include negative equity financing. In considering this issue, it is well to remember that a "purchase money security is an exceptional category in the statutory scheme that affords priority to its holder over other creditors, but only if the security is given for the precise purpose as defined in the statute." *Matthews v. Transamerica Fin. Servs. (In re Matthews),* 724 F.2d 798 (9th Cir. 1984).

The majority opinions, by including negative equity within the formula for PMSI, essentially transform one creditor's unsecured claim into a secured claim at the expense of the debtor's general unsecured creditors. Lenders are given an incentive to roll in as much negative equity as possible in constructing "package" transactions. Such a reading of the statute, giving a "super purchase-money secured claim" to the lender, totally upends the existing priority scheme in bankruptcy. By artificially enlarging the Article 9 concept of a purchase money obligation, these courts have allowed the lenders to take a higher percentage of plan payments and have undercut the distribution scheme designed by Congress.

## Conclusion

Based upon a careful review of existing case law, this Court continues to hold that negative equity is not protected by the "hanging paragraph" of section 1325(a) of the Bankruptcy Code. It is neither "all or part of the price" of a new car nor is it "value given to enable the debtor to acquire rights in or the use of" a new car. As such, it does not fit within the definition of a PMSI under applicable Article 9 guidelines. The Debtor's Objection to the Claim of AmeriCredit is, therefore, SUSTAINED. The Debtor's Amended Plan which bifurcates the

claim into secured and unsecured portions is, accordingly, approved. The Trustee is hereby ordered and directed to file an Order Confirming the Debtor's Amended Plan, in accordance with the foregoing findings of the court.

**IT IS SO ORDERED**.

# # #


Distribution to all counsel.